**TIME INC., Plaintiff,**

**v.**

**PETERSEN PUBLISHING COMPANY, L.L.C., Defendant.**

**No. 97 Civ. 5879(HB).**

United States District Court, S.D. New York.

Sept. 25, 1997.

Thomas C. Morrison, Jennifer Pariser, Pattersen, Belknap, Webb & Taylor, New York City, for Plaintiff.

Sheri J. Engelken, Leonard C. Jacoby, John M. Desmarais, Pamela A. Huelster, Kirkland & Ellis, New York City, for Defendant.

*Opinion and Order*

BAER, District Judge.

In this trademark infringement action, defendant Petersen Publishing Company ("Petersen"), moves for a preliminary injunction, enjoining the further use by Time Inc. ("Time") of the name "Teen People." For the reasons set forth below, Petersen's motion is denied.

### I. *Background*

Time, the publisher of PEOPLE magazine, plans to publish a PEOPLE magazine aimed at teenagers entitled TEEN PEOPLE beginning in about February, 1998, and has been using the name on promotional material since early 1997. Defendant Petersen is the publisher of 'TEEN magazine. On August 28, 1997, Petersen filed an Answer and Counterclaims to a lawsuit instituted by Time. Time's lawsuit is now mooted, but Petersen included a motion for a temporary restraining order and preliminary injunction, claiming that Time's use of the name "Teen People" infringed on its 'TEEN trademark.[1] Petersen seeks a preliminary injunction barring Time from further use of the name "Teen People."

---

1. On August 28th, at a hearing before this Court, Time stipulated that it would not use two particular logos for its TEEN PEOPLE, which logos it had been using to advertise its forthcoming mag-azine. However, I denied Petersen's request for a temporary restraining order that would have barred any use of the name "Teen People."

## II. *Discussion*

In order to prevail on its preliminary injunction motion, Petersen must "establish that it will suffer irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits ... and a balance of hardships tipping decidedly in the moving party's favor." *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 550 (S.D.N.Y. 1996). To succeed on its Lanham Act claims, Petersen must establish that it has a valid mark and that Time's use of the mark is likely to cause confusion with respect to Petersen's mark.[2] *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993).

The "likelihood of confusion" determination is governed by the eight-part *Polaroid* test which instructs the court to consider the following factors: (1) the strength of plaintiff's mark, (2) the degree of similarity between the two marks, (3) the proximity of the products, (4) the likelihood that plaintiff will "bridge the gap", (5) actual confusion, (6) defendant's good faith, (7) the quality of defendant's product and (8) the sophistication of potential consumers. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

### 1. *Strength of the Mark*

In this case, Petersen is asserting broader trademark rights than it owns. Petersen owns a federal trademark for its 'TEEN mark; the trademark is registered for the word "teen" in upper-case block letters, preceded by an apostrophe. Its 'TEEN trademark in its distinctive style does not entitle Petersen to prevent a competitor from using the generic word "teen" as part of a different trademark, to denote a magazine that is targeted to teenagers. *See Gruner*, 991 F.2d at 1077–78 (although plaintiff's "Parents" mark was protectable, that did not preclude another publisher from using the word parents in a generic sense as part of a different mark); *see also, Lang v. Retire-*

*ment Living Publishing Co.*, 949 F.2d 576 (2d Cir.1991).

As explained by the Second Circuit in *Gruner*, "the trademark registration of the title PARENTS in its distinctive typeface did not confer an exclusive right to plaintiff on variations of the word 'parent'...." Similarly, Petersen's 'TEEN trademark does not give it the exclusive right to variations on the use of the word "teen." Therefore, I find that the "teen" portion of Petersen's trademark, as divorced from its particular stylized presentation is an extremely weak mark and Petersen is not entitled to enjoin Time from using the name "Teen People." Although I believe that this conclusion is determinative, I will briefly discuss the *Polaroid* factors.

### 2. *Similarity*

The two magazine logos at issue here are quite dissimilar. In Time's final presentation of TEEN PEOPLE, the predominant part of the name is the upper-case word "people," which is several times larger that the lower-case word "teen." In contrast, in Petersen's presentation of its logo for at least the last year, the word "teen" has been appearing in capital block lettering, preceded by an apostrophe. In addition, the typeface of the word "people" in the TEEN PEOPLE logo is the exact same typeface used on PEOPLE magazine for over 20 years, thus increasing the likelihood as sought by the publisher that TEEN PEOPLE will be associated with PEOPLE magazine in the minds of potential consumers. Finally, the cover page of TEEN PEOPLE will carry the legend below the title, "A new magazine for teens from the editors of PEOPLE."

### 3. *Proximity*

The two magazines are both targeted to teenage girls and young women ages 12 to 19 and will have similar content. They are therefore competitive.

### 4. *Bridging the Gap*

This factor is inapplicable to the instant case because, as mentioned above, the prod-

---

2. Because it is undisputed that Petersen owns a federal registration trademark for 'TEEN, the

only issue here is the likelihood of confusion.

ucts are very similar and therefore there is no gap to bridge.

### 5. Actual Confusion

Petersen had an expert conduct a survey to determine whether there was confusion in the relevant age group between 'TEEN and TEEN PEOPLE. Although there was no hearing and thus no opportunity for a direct examination or cross, Petersen's expert report appears to show that although there was virtually no confusion when the relevant market was asked whether the two magazines were published by the same publisher, there was a small amount of confusion when the subjects were asked whether they thought 'TEEN and TEEN PEOPLE were associated with or connected to each other.[3] However, the amount of actual confusion was minimal. In addition, Petersen's study did not address the issue of whether TEEN PEOPLE is more likely to be associated with PEOPLE or with 'TEEN.

### 6. Good Faith

Good faith was demonstrated on Time's part. Time claims that it plans to use the enormous success of its PEOPLE magazine to promote its TEEN PEOPLE, not the success of 'TEEN. Because Time's logo uses the same typeface for the word "people" as used on its PEOPLE magazine for over twenty years, and because the logo explicitly states that TEEN PEOPLE is from the editors of PEOPLE, it is apparent that Time has not attempted to benefit from 'TEEN's name recognition, but rather from its own PEOPLE magazine's name recognition.

### 7. Quality of the Product

Since TEEN PEOPLE has not yet been published, this factor is inapplicable to the instant case. However, PEOPLE magazine is a high quality product and based on this fact, it is likely that TEEN PEOPLE will also be a high quality product.

### 8. Sophistication of Buyers

The potential buyers of the magazines in question are girls and young women ages 12 to 19, who given their age, are not very sophisticated buyers.

In weighing the above *Polaroid* factors, the factors are not examined by any precise measure, but are weighed only to ascertain whether there is a likelihood of confusion. *Gruner,* 991 F.2d at 1079–80. Overall, given the weakness of the mark "teen," the dissimilarity between the two logos, and the fact that the TEEN PEOPLE logo states that it is a "new magazine for teens from the editors of PEOPLE," I find that Petersen has failed to establish a likelihood of confusion. Accordingly, Petersen's motion for a preliminary injunction is denied.[4]

### III. Conclusion

For the reasons stated above, Petersen's motion for a preliminary injunction is DENIED. Should the parties choose to pursue any aspect of this lawsuit, they will appear on October 9, 1997 for a Pre–Trial Conference in my Chambers at 12:50 p.m. Not hearing from you by October 9, 1997, the case will be closed.

**SO ORDERED.**

---

**3.** In Petersen's study, when comparing TEEN PEOPLE's final logo to 'TEEN magazine, 6% of the subjects thought the two magazines were published by the same publisher, as compared to a finding of 2% in the appropriate control group (who were asked to compare Teen and Seventeen magazine). This shows a net level of confusion of 4%, which is *de minimis*. Petersen's expert also found that 16% of the subjects thought that 'TEEN and TEEN PEOPLE were associated or connected, as compared to 9% of the control group, showing a very small level of confusion (seven percent). (*See* Declaration of Yoram Wind, dated September 22, 1997).

**4.** Although Petersen's motion should be denied for a failure to establish a likelihood of confusion alone, Petersen's delay in bringing the instant motion evidences an absence of irreparable harm. *See Citibank, N.A. v. Citytrust,* 756 F.2d 273 (2d Cir.1985). Petersen admits that it was aware since early 1997 that Time was considering publishing a magazine targeted to girls and young women entitled TEEN PEOPLE. Yet Petersen did nothing until it was sued by Time in August of 1997.