**NATURE'S BEST, INC., Plaintiff,**

**v.**

**ULTIMATE NUTRITION, INC., Defendant.**

**No. CV–04–1541 (TCP)(MLO).**

United States District Court, E.D. New York.

June 30, 2004.

Albert Robin, Robin, Blecker & Daley, New York City, for Plaintiff.

Charles H. Knull, Ullman, Shapiro & Ullman LLP, New York City, for Defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Before this Court is a motion for a preliminary injunction, brought by Nature's Best, Inc. ("Plaintiff" or "Nature's Best"), requesting injunctive relief to enjoin Ultimate Nutrition, Inc. ("Defendant" or "Ultimate Nutrition") from using the brand name "Isopreme" on or in connection with whey protein supplements or health foods of a similar nature.

For the following reasons, Plaintiff's motion is **DENIED**.

### BACKGROUND

Plaintiff is a distributor of vitamins, minerals and food supplements in powdered drink mix, beverage and bar forms to gyms, health clubs, health food stores and sports nutrition stores. (Pl. Mem. of Law at 2) Plaintiff has used the trademark "Isopure" on a line of whey protein meal replacement/after workout supplements since 1998. (*Id.* at 1) The Isopure trademark is registered in the U.S. Patent and Trademark Office for food supplements in powdered drink mix and beverage form, Registration No. 2,304,802, Class 5, issued December 28, 1999. (*Id.* at 2) Plaintiff alleges that it has expended in excess of $10 million in advertising and promoting the Isopure line, which has enjoyed sales in excess of $80 million. (*Id.* at 3)

Defendant is a manufacturer and distributor of dietary supplements. (Def. Mem. of Law at 2) Defendant applied for the "Isopreme" trademark on December 16, 2002. (*Id.* at 3) The mark was published for opposition in the U.S. Patent and Trademark Office ("USPTO") *Official Gazette* on May 27, 2003 and was not met with opposition by "any party [ ] believ[ing] it may [have] be[en] damaged by registration of the mark." (U.S. Patent and Trademark Office, *available at*, http://www.uspto.gov/web/offices/tac/doc/basic/afterapp.htm# pub) (June 22, 2004); (Def. Mem. of Law at 6) The mark was subsequently registered with the U.S. Patent and Trademark Office on February 14, 2004, Registration No. 2,818,238, Class 5, having had no mark cited against it throughout the application process as being potentially confusingly similar. (Def. Mem. of Law at 3, 6)

The Isopreme brand is used on a line of whey protein meal replacement/after workout supplements. (*Id.* at 3–4) Defendant alleges that the Isopreme brand has generated nearly $700,000 in sales in the U.S. and Canada since it was launched a year ago. (*Id.* at 5) The product has also allegedly been advertised in bodybuilding magazines and promoted at various bodybuilding events and trade shows, as well as over the internet and in company catalogs, handouts and flyers. (*Id.*) Defendant maintains that it has expended, thus far, $50,000 to fund these advertisements and promotions, and has allocated an additional $200,000 for advertising during 2004. (*Id.*)

On April 27, 2004, in view of the alleged similarities between Isopure and Isopreme, and the goods upon which each trademark is used, Plaintiff filed the instant lawsuit against Defendant alleging, inter alia, trademark infringement in violation of 15 U.S.C. 1114(1) ("Lanham Act"), and unfair competition and false designa-

tion of origin in violation of Section 43(a) of the Lanham Act. Plaintiff made a motion for a preliminary injunction to enjoin Defendant from using the Isopreme name and a hearing was held by this Court on Thursday, May 27, 2004.

## DISCUSSION

### A. Standard for a Preliminary Injunction

■ In order to obtain a preliminary injunction, Plaintiff must establish: "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [Plaintiff's] favor." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 108 (2d Cir.2003) (quoting *TCPIP Holding Co. v. Haar Communications, Inc.,* 244 F.3d 88, 92 (2d Cir.2001)). There is no need to reach the question of irreparable injury in the instant action because Plaintiff has failed to show either a likelihood of success on the merits or that there are sufficiently serious questions to be litigated.

### B. Likelihood of Success on the Merits or Sufficiently Serious Questions

■ A plaintiff bringing suit under the Lanham Act must show "that it has a valid mark entitled to protection and that defendant's use of it is likely to cause confusion." *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir.1993). Here, Plaintiff's registration of its Isopure trademark establishes its entitlement to protection. *See Franklin Res. v. Franklin Credit Mgmt. Corp.,* 988

F.Supp. 322, 326 (S.D.N.Y.1997) (citing *The Sports Auth., Inc. v. Prime Hospitality, Corp.,* 89 F.3d 955, 960 (2d Cir.1996)). The issue that must be analyzed for purposes of this motion for a preliminary injunction, therefore, is the likelihood of confusion.

### The Polaroid Factors

■ In order to determine whether there is a likelihood of confusion, the Court must look to the eight factors set out under the *Polaroid* balancing test. *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492 (2d Cir.1961); *See also Sports Auth.,* 89 F.3d at 960. Each factor is now taken in turn:

### 1. Strength of the Mark

■ The first factor set out under the *Polaroid* balancing test is an analysis of the strength of the mark, which refers to a mark's "distinctiveness" or "ability to identify goods sold under it as coming from one particular source." *Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 743 (2d Cir.1998). A mark's distinctiveness is evaluated in terms of its inherent distinctiveness as well as its distinctiveness in the marketplace. *Id.* The Second Circuit Court of Appeals has provided four categories, listed in increasing order of strength, to assess a mark's inherent distinctiveness: "(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

■ After a careful consideration of each category, this Court finds that Isopure is no more than a suggestive mark of only moderate strength.[1] "Suggestive terms require 'imagination, thought and

---

1. "A suggestive mark is protected without a showing of secondary meaning." *Gruner +* *Jahr,* 991 F.2d at 1076

perception to reach a conclusion as to the nature of [the] goods ...'" *Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir.1985) (quoting *Stix Prods., Inc. v. United Merchs. & Mfrs., Inc.* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). Isopure falls into the suggestive category because the combination of "Iso" and "pure" to form the mark requires the consumer to, with some creative thought, determine the nature of the product based on the mark itself. For example, Isopure arguably suggests to the consumer "whey protein isolate" in a "pure" form, or perhaps "purely whey protein isolate," as in "solely" or "only."

Having concluded that Isopure is a suggestive mark, this Court now turns to a more thorough evaluation of the mark's strength since "a finding of suggestiveness does not guarantee a determination that the mark is a strong one." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993). In so doing, this Court concludes that Isopure is only of moderate strength. Although Plaintiff argues that Isopure's federal registration "constitutes evidence of its strength," there is a "distinction between the protectablility of a suggestive mark and the mark's strength in the related but discrete context of an action for infringement." *Franklin Res.*, 988 F.Supp. at 328, (Pl. Mem. of Law at 8). Contributing to the weakening of the Isopure mark, in terms of inherent distinctiveness, is its prefix, "Iso." The "Iso" prefix, which gives rise to the most striking similarity between the two marks, is descriptive in nature. "Iso" simply refers to "whey protein isolate," the primary ingredient in both Isopure and Isopreme. (Pl. Mem. of Law at 1; Def. Mem. of Law at 3) Thus, "Iso" is merely an abbreviated, descriptive term and, as such, detracts from the overall strength of the Isopure mark.

Additionally, in evaluating the strength of a suggestive mark, this Court may analyze factors that may contribute to the weakening of the mark with respect to its distinctiveness in the marketplace, such as third-party use of similar marks, duration of use, and sales volume. *Franklin Res.*, 988 F.Supp. at 328. Although Isopure's sales volume is high and the mark has been registered since December 1999, both of which may indicate potentially high national recognition of the product, the pervasive third party use of "Iso" "weighs against a finding that [the] trade name is strong." *Lang v. Ret. Living Publ'g. Co.*, 949 F.2d 576, 581 (2d Cir.1991) (finding that extensive third party use of a word common to the marks of both parties weakened the mark).

"It is well settled that third party registration and use dilutes the strength of the mark." *Franklin Res.*, 988 F.Supp. at 328 (citing *Hutchinson v. Essence Communications, Inc.*, 769 F.Supp. 541, 548 (S.D.N.Y.1991)). In the present matter, there is evidence of substantial third-party use of similar "Iso" marks. The USPTO database currently lists over 250 "Iso" marks in class 5, sixty-six of which are for use on nutritional or dietary supplements. (Def. Mem. of Law at 5) Examples of live marks incorporating "Iso" include "Isomer E," "Isotein," and "Isolean." (*See* Trademark Electronic Search System of the U.S. Patent and Trademark Office, *available at,* http://tess2.uspto.gov/bin/gate.exe?f=tess & state=ugd2fu.1.1) (June 22, 2004) As a result of this widespread use of "Iso" as part of registered marks of other similar products, the distinctiveness of Isopure as a mark in the marketplace has been severely diluted, detracting from its overall strength. *See Streetwise*, 159 F.3d at 743 (finding that "Streetwise" is not distinctive given the extensive use of the words "street" and "wise" in names registered by manufactur-

ers of other products); *W.W.W. Pharm. Co.*, 984 F.2d at 573 ("extensive third-party use of the words sport and stick weighs against a finding that [plaintiff]'s trade name is strong.").

In sum, Isopure is a suggestive mark of only moderate strength due to its descriptive prefix and extensive use of similar marks by third-parties.

## 2. Degree of Similarity between the Marks

■ The second factor under the *Polaroid* test is the similarity of the two marks. When evaluating the degree of similarity between marks, courts consider the "overall impression" created by each mark as a whole. *Brennan's Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 133 (2d Cir.2004). While two marks may be similar, this is not dispositive as the primary inquiry is whether the similarity is likely to cause confusion among consumers. *Id.* (citing *Gruner + Jahr*, 991 F.2d at 1078). As discussed *supra*, Isopure invokes "pure whey protein isolate," with "pure" existing as a stand-alone word that simply follows "Iso." Isopreme, on the other hand, goes further than Isopure. Isopreme is a creative play on the word "supreme," interconnecting "Iso" and "supreme" to create the hybrid "Isopreme," as in "is supreme." Isopreme also invokes the idea of whey protein isolate as a "supreme source of protein" in contrast with Isopure's "pure whey protein isolate." These distinct impressions created in the mind of the consumer favors Defendant as there is a low likelihood of confusion.

In evaluating the similarity between two marks, courts will also assess the "context in which [the products] are found and con-

sider the totality of factors that could cause confusion among prospective purchasers." *Streetwise*, 159 F.3d at 744 (quoting *Gruner + Jahr*, 991 F.2d at 1078). In the instant case, this evaluation reveals that such factors further serve to differentiate the products such that they are not confusingly similar. For example, Isopure and Isopreme are sold in different serving sizes,[2] are offered at different prices and, importantly, are manufactured using different processes, each of which are promoted accordingly. (Decl. of Brian Rubino at 7) *See Streetwise*, 159 F.3d at 744 (finding that the marks were not confusingly similar due, in part, to differences in packaging and presentation). These additional distinctions are not likely to go unnoticed by Isopure's sophisticated consumers, which include primarily bodybuilders, dieters and those who have had weight loss surgery. (*See, infra,* Discussion of third and eighth *Polaroid* factor).

The distinct impressions created by Isopure and Isopreme, coupled with the additional differences apparent to the sophisticated consumer, result in this Court's conclusion that the marks are not sufficiently similar so as to cause confusion.

## 3. Proximity of the Products & Sophistication of the Buyers

The third *Polaroid* factor is the proximity of the two products in the consumer marketplace. Under Second Circuit authority, the third *Polaroid* factor should be considered in conjunction with the eighth factor, sophistication of the consumers. *See Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir.1996) ("The eighth Polaroid factor, 'sophistication of the buy-

---

2. Submitted to the Court by the Defendant on the argument are samples of the products in bottle, box and package forms which in each case are strikingly different in lettering, size,

color and shape and in the descriptive material on the covers. Visually, there is little or no likelihood that one product may be mistaken for another.

ers,' has been called 'analogous' to the proximity factor"); *See also Franklin Res.*, 988 F.Supp. at 329; *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 449 (S.D.N.Y.1982) ("The question of the proximity of the products is considered in connection with the question of the sophistication of the buyers because the closeness of the two products is, at least in part, a function of the extent to which purchasers can and do examine and distinguish them").

In the instant action, there is no question that Isopure and Isopreme are sold in and to the same markets, stores and consumers. The close marketplace proximity of the two products, however, becomes much less meaningful and therefore, unlikely to cause confusion, when one considers the sophistication of the consumers who buy them. *See TCPIP Holding Co. v. Haar Communications, Inc.*, 244 F.3d 88, 102 (2d Cir.2001) ("The more sophisticated the consumers, the less likely they are to be misled by similarity in marks."). Plaintiff and Defendant agree that both Isopure and Isopreme are used primarily by bodybuilders and athletes, dieters and those who have had weight loss surgery. (Tr. Prelim. Inj. Hr'g at 12–13; Def. Mem. of Law at 19) These types of individuals are among the most sophisticated of consumers because they are conscientious in the nutrition choices that they make and carefully read labels. (*See* Decl. Of Barry Burnett; Decl. Julie Dearth)

Courts have acknowledged that consumers selecting products or treatments that "affect their physical appearance and health" are "likely to exercise a great deal of care." *Katz v. Modiri*, 283 F.Supp.2d 883, 898 (S.D.N.Y.2003). Bodybuilders, for whom physical health and appearance are central to their livelihood, are certain to be conscious of the products they are selecting for consumption. (*See* Decl. of Barry Burnett; Decl. of Julie Dearth) Likewise, dieters and those who are have had weight loss surgery are going to be acutely aware of their dietary purchases. Indeed, it seems highly unlikely that confusion between these two nutritional supplements will occur when it is precisely the nutritional aspect of the product that is of greatest significance to the buyers in question. Whether a buyer seeks the product as part of an overall bodybuilding regiment or for other dietary/medical reasons, or a combination of the two, it is clear that a careful and informed decision would accompany any purchase of Isopure or Isopreme and as a result, the likelihood of confusion is exceedingly low.

### 4. Likelihood that the Owner of the Mark will Bridge the Gap

The fourth *Polaroid* factor is an inquiry into whether either the senior or junior user of the mark is likely to bridge the gap and enter into the other's market. *Sports Auth.*, 89 F.3d at 963; *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir. 1979). This inquiry is unnecessary in the instant case as both parties admit that they are competitors in the same business and, consequently, there is no gap to be bridged.

### 5. Actual Confusion

The fifth factor under the *Polaroid* test is whether the disputed trademark has caused actual confusion among consumers in the marketplace. At the preliminary injunction hearing, Plaintiff admitted that "[t]here has of course been no actual confusion." (Tr. Prelim. Inj. Hr'g. at 29) Accordingly, the fifth Polaroid factor militates against a finding of likelihood of confusion.

### 6. Defendant's Good Faith in Adopting the Mark

The sixth factor under the *Polaroid* Test is whether Defendant adopted its trade-

mark in good faith. In order to show bad faith, a claimant must demonstrate that a defendant adopted the mark with the "intention of capitalizing on the mark holder's reputation and goodwill." *Lang,* 949 F.2d at 583.

Here, Plaintiff argues a lack of good faith on Defendant's part because the latter had constructive knowledge of the Isopure mark since April 3, 1998, when Plaintiff filed its application to register the mark, and that Defendant "must have known" of Isopure in the period following the product's introduction. (Pl. Mem. of Law at 13) Plaintiff further argues that there is "no conceivable good faith basis for Ultimate Nutrition's adoption of its product name." (*Id.* at 13–14) Plaintiff, however, offers no evidence beyond mere conjecture that Defendant adopted its mark in bad faith.

To the contrary, Defendant's evidence tends to show no intent on its part to capitalize on any perceived goodwill of Plaintiff in the marketplace. Defendant has its own extensive product line, marketed under its "Ultimate Nutrition" house mark, and has invested considerably in the promotion and advertisement of Isopreme. (Def. Mem. of Law at 5, 24) Further, Defendant convincingly explained at the preliminary injunction hearing and in its supporting papers that the Isopreme name was not chosen for its alleged similarity to Isopure, but from the combination of the prefix "Iso," a key ingredient in the product, and the word "supreme," to describe the quality of their product. Finally, Defendant's use of "supreme" in its mark is consistent with its previous use of "supreme" in other products within its product line. (Decl. of Brian Rubino at 9)

Accordingly, there has not been a showing of any bad faith on Defendant's part.

### 7. Quality of Defendant's Product

The seventh factor under the *Polaroid* Test is the quality of Defendant's product in relation to the quality of Plaintiff's product. "If an infringing product is of inferior quality, the senior user is entitled to protect 'the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user ...'" *W.W.W. Pharm. Co.,* 984 F.2d at 575 (quoting *Scarves by Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1172 (2d Cir.1976)). Here Plaintiff does not allege that Defendant's product is in any way inferior to its own and, consequently, there is no danger of damaging Plaintiff's reputation.

### 8. Sophistication of the Buyers

The eighth *Polaroid* factor has been analyzed *supra* in connection with the third *Polaroid* factor, the proximity of the products. (*See, supra,* p. 433)

#### Analysis

Taking all of the *Polaroid* factors into consideration, this Court concludes that there is a low likelihood of confusion. Isopure is a suggestive mark that, although registered, is of only moderate strength. *See Franklin Res.,* 988 F.Supp. at 328. Further, Isopure and Isopreme, although similar, are not sufficiently similar so as to cause confusion, especially in light of the high level of sophistication of the buyers. Finally, there was no showing of actual confusion, a bad faith adoption by Defendant of the Isopreme mark, or of any inferior attributes of Defendant's product. While there is close proximity between the marks and no gap to be bridged in this case, these factors do not outweigh the other considerations leading to the ultimate conclusion that there is a low likelihood of confusion between Isopure and Isopreme. Therefore, Plaintiff has failed to establish either a likelihood of success

on the merits or that there are sufficiently serious questions to be litigated.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is hereby DENIED.

SO ORDERED.